UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 2:24cr87 |
| ) | |
| MICHAEL LEE COREY MALONE, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S OPPOSITION TO A FINDING THAT
THE GOVERNMENT HAS SATISFIED THE FIRST *SELL* FACTOR**

The government moves for a ruling on the first factor set forth in *Sell v. United States*, 539 U.S. 166 (2003), regarding the strength of the government's interest in the involuntary administration of antipsychotic drugs to Mr. Malone to facilitate his prosecution. ECF No. 43. It argues its interest is significant by virtue of the nature of Mr. Malone's alleged threats and the possibility that he could face additional incarceration and a period of supervision if convicted.

The government has not met its burden of establishing that important governmental interests are at stake by clear and convincing evidence. *See United States v. Bush*, 585 F.3d 806, 814 (4th Cir. 2009). To the contrary, the circumstances of this case do not support such a finding. The alleged crimes are not sufficiently serious to warrant a severe intrusion into Mr. Malone's liberty—the involuntary alteration of his will. He is unlikely to receive a lengthy sentence, and he has already spent more than a year in pretrial custody. Further, the government acknowledges that Mr. Malone is already prohibited from possessing firearms and faces the possibility of civil commitment, which undermine the government's interest in prosecuting him for these offenses. The Fourth Circuit has admonished courts that medication orders should not be casually deployed, and this case is not sufficiently exceptional by any measure. *United States v. White*, 620 F.2d 401 (4th Cir. 2010).

1

Separately, the government has not offered any authority to support its request that the Court isolate the first *Sell* factor simply because the government cannot make its case on the other factors without a favorable preliminary ruling. If the government cannot satisfy its burden under the other *Sell* factors, then the Court should not help it clear that hurdle with a potentially advisory ruling on the first factor in isolation.

## Background

The government has charged Mr. Malone with three offenses arising out of two alleged phone calls to the United States courthouses in Alexandria and Richmond: two violations of 18 U.S.C. § 844(e), interstate threats, and one violation of 18 U.S.C. § 115(a)(1)(B), threatening an official. ECF No. 22.

According to the government, on July 10, 2024, Mr. Malone called the clerk's office of the Alexandria federal courthouse from the Virginia Beach City Jail to inquire about the status of his civil cases. Mr. Malone initially called a female acquaintance, who then dialed the courthouse and remained on the line. During the call, Mr. Malone provided his real name and a case number to the clerk, then allegedly stated, "I would just like to tell you that, um, I'm supposed to be released tomorrow and that there's a bomb in your building and upon my release I'm going to kill the president." ECF No. 43, at 1–2. On August 2, 2024, Mr. Malone allegedly made another phone call from jail during which he stated he had placed a bomb in the Richmond federal courthouse. *Id.* at 2. Per discovery, the government does not allege that Mr. Malone communicated directly with a federal government employee on this occasion, but rather that the alleged statement was communicated to a state public defender.

According to investigation reports, both calls were investigated, but neither was understood to communicate any serious threat. After the July call, investigators "immediately verified" that

2

Mr. Malone was currently incarcerated, had been incarcerated since 2021, and had documented mental health issues. USAO_000105. They also confirmed that he was not going to be released the next day; indeed, they learned he was "extremely unlikely to be released on bond" at all. USAO_000087. Based on those findings and the reaction to Mr. Malone's statement by the female caller who had helped him dial the courthouse—she sighed, said she wasn't "cool" with what he said, and that she would not be calling anyone else—the call was deemed a hoax and no evacuation was recommended. *Id.* A few weeks later, investigators interviewed the female caller, who stated that Mr. Malone had wanted someone to come speak to him and start looking into his "situation," meaning his long-held belief that various persons and groups are conspiring against him. USAO_000088–90. Investigators also spoke to the clerk who received the call, who stated she felt calm and unconcerned at the time because of Mr. Malone's polite and pleasant manner and his efforts to identify himself. USAO_000092. She concluded he was trying to get law enforcement's attention or trigger a reaction, and she was able to get back to work after the call without issue. *Id.*

After the second call, investigators likewise quickly determined that Mr. Malone was incarcerated. USAO_000096–97. Mr. Malone allegedly made the second threat alongside other statements about his ex-father-in-law, a key player in his perceived conspiracy, supporting the likelihood that the call may have been made to get the attention of law enforcement. *Id.* Here too, there is no indication the Richmond courthouse was evacuated or that the alleged threat caused the clerk whom it was relayed to any greater degree of distress.

Mr. Malone has been in federal pretrial detention for over fourteen months, since October 23, 2024. The Court found Mr. Malone incompetent to stand trial at an evaluation on April 18, 2025 and ordered that he be evaluated for restoration. ECF Nos. 39, 40. The finding was based on a local competency evaluation that determined Mr. Malone cannot consult with an attorney with a

reasonable degree of rational and factual understanding due to a delusionary disorder with persecutory and grandiose beliefs.

Pursuant to the Court's Order, psychologists with the Bureau of Prisons evaluated Mr. Malone. They similarly found deficits in his ability to rationally understand courtroom proceedings and assist counsel in his defense. Throughout the evaluation period, Mr. Malone consistently expressed opposition to taking psychotropic and psychiatric medication. A subsequent report noted that, despite Mr. Malone's untreated psychotic symptoms, he "has been free from aggressive or self-destructive behavior since his arrival at FMC Butner" and "there is no convincing evidence Mr. Malone currently poses a substantial risk of dangerousness in the current conditions" such that involuntary medication is not available under *Washington v. Harper*, 494 U.S. 210 (1990). BOP Forensic Evaluation, at 13–14. A risk panel screening recorded similar findings and further opined that threshold criteria for civil confinement under 18 U.S.C. § 4246 are met due to the "potential nexus" between Mr. Malone's illness and his past violent behavior, which was not elaborated upon. BOP Risk Panel Screening, at 1.

On December 19, 2025, the government moved for a ruling that important governmental interests are at stake in bringing Mr. Malone at trial, which the BOP evaluators had indicated was a threshold to the submission of a proposed treatment plan to forcibly medicate Mr. Malone. ECF No. 43; *see* BOP Forensic Report, at 13–14.

## Legal Standard

"The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Washington v. Harper*, 494 U.S. 210, 229 (1990). The interference is "'particularly severe'" when the medication is antipsychotic, "for the use of such medications threatens an individual's 'mental, as well as physical, integrity[.]'" *United*

4

*States v. Watson*, 793 F.3d 416, 419 (4th Cir. 2015) (first quoting *Riggins v. Nevada*, 504 U.S. 127, 134 (1992), then *United States v. White*, 620 F.3d 401, 422 (4th Cir. 2010) (Keenan, J., concurring)). Above and beyond the "violence inherent in forcible medication," and in addition to the risk of harmful side effects, the forcible administration of antipsychotics constitutes an "invasion into a person's mental state" that is expressly intended "'to alter the will and mind of the subject.'" *Id.* (quoting *Bush*, 585 F.3d at 813). Such "forced drugging . . . constitutes a deprivation of liberty in the most literal and fundamental sense." *Harper*, 494 U.S. at 237–38 (Stevens, J., dissenting).

Accordingly, the Supreme Court has recognized that "an individual has a constitutionally protected liberty 'interest in avoiding involuntary administration of antipsychotic drugs'—an interest that only an 'essential' or 'overriding' state interest might overcome." *Sell*, 539 U.S. at 178–79 (quoting *Riggins*, 504 U.S. at 134, 135). The government's interests in a criminal prosecution may sometimes rise to that level, but as the Fourth Circuit has emphasized in cases applying the *Sell* standard, forcible medication "is not justified every time an incompetent defendant refuses treatment[.]" *Watson*, 793 F.3d at 419. In "'**rare**'" cases, "a mentally ill defendant who is not dangerous to himself or others . . . may nevertheless be forcibly medicated for the sole purpose of rendering him competent to stand trial. But that is the **exception**, not the rule." *Id.* (quoting *Sell*, 539 U.S. at 180) (emphasis added). "[F]orcible medication under *Sell* is 'a tool that must not be casually deployed,' and courts must be vigilant to ensure that such orders, which 'carry an unsavory pedigree,' do not become 'routine.'" *Id.* (quoting *United States v. Chatmon*, 718 F.3d 369, 373–74 (4th Cir. 2013)).

In *Sell*, the Supreme Court held:

> [T]he Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in

5

>order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests.

*Id.* at 179. In other words, there is a four-part test: "*First,* the government must show that '*important* governmental interests are at stake.' *Second,* it must show that 'involuntary medication will *significantly further* those concomitant state interests.' *Third,* it must show that 'involuntary medication is *necessary* to further those [governmental] interests.' *And fourth,* it must show that administration of the drugs is *medically appropriate.*'" *Bush*, 585 F.3d at 813–14.

The government must prove each factor by clear and convincing evidence. *Id.* at 814. That is a "heavy burden, requiring 'evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established,' or 'evidence that proves the facts at issue to be highly probable.'" *Watson*, 793 F.3d at 420 (quoting *United States v. Heyer*, 740 F.3d 284, 292 (4th Cir. 2014)). This is a "deliberately high standard for the government to satisfy" to "'minimize[] the risk of erroneous deprivations in this important context[.]'" *Id.* at 419–20 (quoting *Bush*, 585 F.3d at 814).

Regarding the first factor, the government's "interest in bringing to trial an individual accused of a serious crime is important[,]" but "[s]pecial circumstances may lessen the importance of that interest." *Sell*, 539 U.S. at 180. Courts "must consider the facts of the individual case in evaluating the government's interest in prosecution[,]" including any factors that "diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Id.* Such factors include the defendant's potential for future confinement, such as the possibility of civil commitment, and the amount of time the defendant already has been confined for which he would receive credit towards any sentence ultimately imposed. *Id.* As for when a charged crime is "serious" for purposes of the *Sell* analysis, the Fourth Circuit has instructed courts to consider "the

6

maximum penalty authorized by statute," *United States v. Evans*, 404 F.3d 227, 237 (4th Cir. 2005), as well as the likely guideline sentence and the nature of the alleged crime, including the harm the defendant allegedly caused or could have caused, *see White*, 620 F.3d at 413–19.

## Argument

The government asserts that a ruling on the first *Sell* factor is necessary for the BOP to prepare a treatment plan that will inform the remaining factors. ECF No. 43, at 4. If the Court reaches the merits of the government's request, it should find that the government has not met its burden on the first factor because the circumstances of this case undermine the government's claimed interest in prosecuting Mr. Malone.[1] However, because the government does not even attempt to make its case on the other *Sell* factors, the Court need not issue an advisory ruling on the first factor, even if that is what the BOP has requested.

### I.  The government has not met its burden on the first *Sell* factor.

The government's argument on the first *Sell* factor relies on two Fourth Circuit cases that involved threats to government officials. *See Bush*, 585 F.3d at 814; *Evans*, 404 F.3d at 232. However, both cases involved much more serious allegations and are otherwise distinguishable.

In *Evans*, the defendant, a military veteran, made face-to-face threats to an agent of the United States Department of Agriculture's Rural Development Agency. *Evans*, 404 F.3d at 232–33. The defendant had received a late-payment notice on a housing loan administered by the agency, and while speaking to the agent, he became "extremely loud and angry." *Id.* During a long rant, he stated he had "three crosses in his yard" for Ruby Ridge, Waco, and Oklahoma City—

---

[1] The defense does not address the prospect for an insanity defense for Mr. Malone. Other courts have found the possibility of an acquittal by reason of insanity diminished the government's interest in a prosecution. *See, e.g.*, *United States v. Morrison*, 415 F.3d 1180, 186 (10th Cir. 2005); *United States v. Ruiz-Gaxiola*, 623 F.3d 684, 695 (9th Cir. 2010). The defense will brief that issue if the Court would find it helpful.

widely reported incidents of violent resistance against the government—and that he had "lived his life, and would not mind taking a few with [him]." *Id.* He claimed to be experienced with "chemical and biological warfare" and threatened that the agency should straighten-out his loan or he would show them what "terrorism" could do. *Id.* He was arrested and charged under 18 U.S.C. § 111(a)(1). *Id.* Two years later, in the midst of *Sell* proceedings, he told fellow inmates that the magistrate judge overseeing his case was responsible for his continued incarceration, that he had a good idea where she lived, and that he would "find her, hunt her down, and get rid of her and her family" when he was released from prison. *Id.* at 234. For that threat, he was also charged with a violation of 18 U.S.C. § 115(a)(1)(B), carrying a 10-year max sentence. *Id.* The Fourth Circuit held that "threatening to murder a federal judge under § 115(a)(1)(B)" was sufficiently serious given the maximum sentence, rejecting the consideration of the defendant's probable guidelines range as "unworkable." *Id.* at 238.[2]

In *Bush*, the defendant suffered from severe delusions of persecution that had led her to file over 100 civil lawsuits. *Bush*, 585 F.3d at 809–10. She became convinced that the judges hearing her cases were "committing acts of abuse and assaults against her" by dismissing her claims, which she believed caused her to suffer several health problems. *Id.* at 810. Acting on these beliefs, she

---

[2] *Evans* was decided shortly after *United States v. Booker*, 543 U.S. 220 (2005), in which the Supreme Court held the Sentencing Guidelines were advisory. The panel's focus on statutory maximums was rooted in post-*Booker* uncertainty and the definition of "serious" used in another constitutional context to determine when the Sixth Amendment jury trial right attaches. Other courts disagreed with the Fourth Circuit's approach, which is not consistent with *Sell*. *See, e.g.*, *United States v. Hernandez-Vasquez*, 513 F.3d 908, 918–19 (9th Cir. 2008) ("Although the sentencing guidelines no longer are mandatory, they are the best available predictor of the length of a defendant's incarceration. While the statutory maximum may be more readily ascertainable, any difficult in estimating the likely guideline range exactly is an insufficient reason to ignore *Sell*'s direction that courts should consider the specific circumstances of individual defendants in determining the seriousness of a crime."). The Fourth Circuit later repudiated the blinkered analysis of *Evans* in *White*, as discussed below.

8

wrote a letter to three U.S. district judges connected to one of her lawsuits in which she stated her "intentional infliction of (or, if she misses, her attempt to inflict) physical harm . . . is said to be justified when she acts in proper self-defense against" the judges and that she "may slay any of such persons or all of them, if it reasonably appears to her to be necessary so to do to protect herself from anymore great bodily harm or death." *Id.* The FBI took her threat seriously and warned her to desist; at the same time, another district judge on the same court issued an opinion warning the defendant not to include threatening language in future communications with the court. *Id.* The defendant then wrote another letter addressed to the fourth judge, titled "NO THREAT," that included the same language about "slaying" in self-defense with the addition of the fourth judge's name to the list of targets. *Id.* at 810–11. The FBI arrested her and charged her under 18 U.S.C. § 876(c), which carried a maximum penalty of 10 years' imprisonment for each charge. *Id.* at 811, 814. On appeal, the panel affirmed the lower court's finding that the government had an important interest in prosecuting the defendant based on her maximum term of imprisonment and supervision, and the fact that a conviction would prevent her from possessing firearms. *Id.* at 815.[3]

Both cases, then, involved "a defendant who had allegedly threatened the life of a federal judge" among other serious conduct. *White*, 620 F.3d at 411. While the government uses a high level of generality to argue those cases should control here, the Fourth Circuit has since made clear that *Evans* and *Bush* "provide guidance" but cannot "control the outcome of [the] fact-intensive inquiry into the special circumstances of [a] case." *Id.* In *White*, the Fourth Circuit rejected the government's reliance on those cases and conducted an extensive and thorough analysis that

---

[3] The panel also suggested "the very fact that the government is prosecuting Bush for this conduct conveys a message about its seriousness and its consequences." *Bush*, 585 F.3d at 815. However, that is merely "a truism, applicable to *any* case where the government seeks forcible medication: without a prosecution, there would be no case." *White*, 620 F.3d at 413 n.9.

9

considered the defendant's probable future incarceration, the nature of the alleged crimes, the risk to public safety posed by the defendant, and her unique medical circumstances. *Id.* at 421–22. Ultimately, it considered all the circumstances in the aggregate and asked whether the case was "sufficiently exceptional to warrant the extraordinary measure of forcible medication[,]" concluding it was not. *Id.* at 413, 422. Because many of the same considerations point the same direction here, the Court should reach the same conclusion.

### A. Time already in custody and potential future incapacitation

The government argues Mr. Malone faces a lengthy period of incarceration based on its calculation of his sentencing guidelines range and the likelihood that he would be sentenced to a term of supervised release if convicted. While the government implicitly concedes that the inquiry on this point extends beyond the statutory maximum term of imprisonment and must consider the probable sentence, its calculations inflate that value, it overlooks the time needed to litigate and attempt to restore competency, and it does not give adequate weight to the fact that Mr. Malone faces civil commitment if he continues to refuse medication.

Even when an accused faces a maximum term of imprisonment of 10 years or more, courts in this circuit look beyond that unparticularized metric and consider the sentence the person might realistically receive for the charged crimes, as well as the time needed to litigate and restore competency. In *White*, the court considered the likely sentencing guidelines alongside the median and mean sentences imposed for the charged crimes at a local and national level. *White*, 620 F.3d at 415–16. The Fourth Circuit also accounted for appellate timelines and good time credits. *Id.* at 414–15. This Court, too, has taken a broader view; in *United States v. Duncan*, 968 F. Supp. 2d 753, 762–66 (E.D. Va. 2013), Judge Raymond Jackson considered the sentencing guidelines range, the availability of good conduct credits, appellate review timelines, and the time needed to forcibly

medicate the defendant and restore competency. The Court found that the defendant would probably spend more than 30 months in custody before the government could prosecute him, well above his advisory guidelines range. *Id.* at 764. Consistent with *White*, it concluded such circumstances undermined the government's interests in the prosecution. *Id.*; *see also, e.g.*, *United States v. Almendarez*, 179 F. Supp. 3d 498, 504–06 (W.D. Pa. 2016) (holding first *Sell* factor not met when defendant charged with multiple threats under § 115 and § 875(c) would likely serve more time before sentencing than any sentence he would likely receive due to necessary delays).

Here, Mr. Malone has been in federal pretrial custody for over 14 months. Assuming the Court rules on the pending motion within the month, it will take at least another 4 months to litigate the remaining *Sell* factors (including time for the BOP to prepare a treatment plan, briefing, and a hearing) and for the Court potentially to order involuntary medication. That order would be appealed, which will take at least another 6 months, with another 6 months to seek *en banc* and Supreme Court review. *See White*, 620 F.3d at 414; *Duncan*, 968 F. Supp. 2d at 763. Then, Mr. Malone would be forced to take the prescribed medication and evaluated to determine whether he is competent to stand trial and assist in his defense. The government has not offered any estimate for how long that might take, and it is fair to assume another 6 months, including transportation back to this district for trial. Thus, under the best-case scenario, Mr. Malone would likely have been incarcerated for an additional 23 months before trial takes place. Added to the 14 months he already has served, plus an approximate 4 months of good time credit, *see Barber v. Thomas*, 560 U.S. 474 (2010) (calculating good time credit before the First Step Act), results in an effective sentence of 41 months.

Then there's the matter of the time needed to get to sentencing. Pretrial litigation and trial will take at least another 4 months, depending on whether any additional motions are litigated.

11

Assuming a conviction, Probation will need to prepare a Presentence Report, and the parties will need to litigate the sentence, adding at least another 3 months before the Court sentences Mr. Malone. If, on the other hand, Mr. Malone were to plead guilty, he would receive some degree of acceptance credit that would reduce his advisory guidelines range and probable sentence—a factor the government's calculations do not address.

Whether the Court looks at only the time needed before restoration (an effective sentence of 41 months) or the time needed before sentencing, Mr. Malone will have spent years in pretrial detention, much of it at a BOP facility. So, how does that stack up against his probable sentence? The government suggests Mr. Malone could have an advisory guidelines range as low as 33-41 months (OL 14, CHC V), which is lower than the time he can reasonably be expected to have served before sentencing. The high-end of the government's calculation, 85-105 months (OL 22, CHC VI), is unrealistic and turns on the application of several dubious enhancements. It includes an enhancement for obstruction based on an alleged incident in which Mr. Malone called the female caller and told her to get rid of her phone—a phone law enforcement never even considered seizing or searching—that did not in any way obstruct this investigation. That enhancement is not likely to apply. *See* U.S.S.G. § 3C1.1, cmt. n.4(D) (describing covered conduct to include the destruction of *material* evidence). It also results in large part from the inclusion of an enhancement for threatening the President, the basis for Count Two, which adds 6 levels. If Mr. Malone is acquitted of that charge, his range would be much lower; in any event, the application of that enhancement will be heavily litigated. Finally, there's the potential for the Court to sentence below the guidelines range, given the mitigating circumstances of Mr. Malone's mental health and the lack of significant disruption caused by his alleged conduct.

Indeed, the average and median sentences for persons sentenced under U.S.S.G. § 2A6.1 with criminal history categories of V and VI show sentences well below what the government speculates. The following figures are from the Sentencing Commission's data analyzer:





In sum, Mr. Malone will likely have served more than 41 months before he can be tried, and even more before he would be sentenced. For that term of imprisonment to fall substantially below Mr. Malone's probable sentence, the government would have to win every issue at sentencing, and Mr. Malone would have to receive no credit for acceptance of responsibility. The Fourth Circuit in *White* emphasized that a defendant need only have served a "significant amount" of their probable sentence for that factor to weigh against the government. *White*, 620 F.3d at 418 (quoting *Sell*, 539 U.S. at 180). The government has not established otherwise. *Cf. United States v. Martikainen*, No. 1:19-cr-128, 2021 WL 881263, at *8 (W.D.N.C. Mar. 9, 2021) (finding defendant who was detained for 15 months would not likely face significant additional confinement if restored and convicted).

Adding a term of supervised release to these calculations does not move the needle. The Fourth Circuit in *White* also downplayed the weight given to a potential term of supervised release, noting the defendant could be prosecuted if she committed a crime in the future "whether or not she is on supervised release" and that she would have the support of family, friends, and a wide array of governmental and private human services agencies to address her needs beyond the criminal legal system. *Id.* at 418 n.25. For similar reasons, Judge Jackson found in *Duncan* that the potential placement of the defendant on supervised release did not strengthen the government's interest in the prosecution. *Duncan*, 968 F. Supp. 2d at 767.

Finally, as the government acknowledges, Mr. Malone faces the possibility of civil commitment under 18 U.S.C. § 4246 if he is not forcibly medicated for purposes of trial. ECF No. 43, at 4 & n.2. The BOP Risk Panel Screening reported the opinion of BOP psychologists that "threshold criteria for § 4246 are met." While the defense does not concede that point, for purposes of the government's present request, that possibility also weighs against the government's interest

in forcibly medicating Mr. Malone for trial, as it addresses the concern that he would be released without any form of oversight and pose a risk to the public. *See Sell*, 539 U.S. at 180; *see also United States v. Grigsby*, 712 F.3d 964, 970–73 (6th Cir. 2013) (discussing this circumstance and noting the defendant need only face a "potential" for future civil confinement for it to weigh against the government).

### B. Seriousness of the allegations

"Not every crime is equally serious." *White*, 620 F.3d at 419. When an alleged offense is nonviolent or otherwise minor in terms of the harms it caused or threatened to cause, the nature of the offense "lessens the government's interest" in prosecution. *Id.*; *see also United States v. Boima*, 114 F.4th 69, 77 (2d Cir. 2024) (noting "a judge may also consider . . . the individual facts of the case as they relate to the factors set forth in 18 U.S.C. § 3553(a)"); *United States v. Valenzuela-Puentes*, 479 F.3d 1220, 1226 (10th Cir. 2007) ("Whether a crime is 'serious' relates to the possible penalty the defendant faces if convicted, as well as the nature or effect of the underlying conduct for which he was charged."); *Hernandez-Vasquez*, 513 F.3d at 919 (same). In *White*, the Fourth Circuit focused on the nonviolent nature of the offense and the fact that the prosecution would not benefit the victims of the defendant's alleged fraud and determined those factors undermined and diminished the government's interest. *White*, 620 F.3d at 419.

Other courts have reasoned similarly in cases involving bomb threats. In *United States v. Berry*, 911 F.3d 354 (6th Cir. 2018), the defendant was charged with a violation of 18 U.S.C. § 1038(a)(1)(A) for placing a briefcase made to look like a bomb outside of a bank that he had a dispute with. *Id.* at 357–58. In rejecting the government's request to forcibly medicate him for trial, the Sixth Circuit reasoned the briefcase was not actually a bomb, that causing fear was not violent, and that no physical injury resulted from the alleged act. *Id.* at 364. It reasoned the "basic

15

Case 2:24-cr-00087-JAG-LRL   Document 45   Filed 01/02/26   Page 16 of 20 PageID# 199

human need for security" served by the criminal law was "relatively less implicated" in such circumstances, such that the nature of the crime militated against there being an important governmental interest. *Id.*

Likewise, in *United States v. Rogers*, 83 F. Supp. 3d 657 (M.D.N.C. 2015), the defendant was charged with threatening to blow up a government building in violation of 18 U.S.C. § 844(e). *Id.* at 658–59. The court determined the government's interest in his prosecution was undermined in part by the nature of the offense conduct: "while the crime at issue did involve threats of violence, the Government has not offered any evidence that the persons who received the threats considered them to be real threats likely to be carried out as opposed to the ranting of a mentally ill person, nor has the Government offered any evidence that Mr. Rogers intended to carry out his threats or had the mental capacity to attempt to carry out his threats." *Id.* at 661. The court concluded the government's "significant" interest in the prosecution was nevertheless "not enough by itself to allow the Government to force an unwilling person to submit to involuntary medication." *Id.*; *see also, e.g.*, *United States v. Duncan*, 224 F. Supp. 3d 580, 584 (W.D. Ky. 2016) (finding government's interest in prosecution lessened where the offense was nonviolent and the defendant was not believed to pose a threat to anyone involved).

So too here. There is no indication Mr. Malone's alleged nonviolent conduct caused distress to courthouse employees. Certainly, no one was harmed. To the contrary, the calls were almost immediately recognized as hoaxes and attempts to get attention by an individual who had no means of following through on his words.

### C. Public safety concerns

The next circumstance addressed by the Fourth Circuit in *White* were the "significantly diminished" public safety concerns arising from a failed prosecution of the defendant. *White*, 620

16

F.3d at 419–20. While the possibility that an accused would be prevented from acquiring and possessing firearms as the result of a successful conviction may strengthen the government's interest in a prosecution, *see Bush*, 585 F.3d at 806, when a defendant is already a prohibited person for some independent reason, that is not the case.

Like the defendant in *White*, Mr. Malone is accused of nonviolent offenses and already prohibited from possessing firearms due to his prior felony convictions. Moreover, his most recent conduct in prison since his transfer to Butner has been good, without any noted disciplinary infractions or violent behavior. The Court should conclude public safety concerns do not support the government's interest in prosecuting Mr. Malone. *See also Berry*, 911 F.3d at 364–65 (noting the fact that the defendant did not pose a risk to himself or others," as confirmed by his federal medical evaluation, "undercuts the governmental interest necessary to medicate him").

### D. Whether this case is sufficiently exceptional to warrant a severe intrusion into important liberty interests

The last piece of the *White* court's analysis looked at the case as a whole and asked whether it was "sufficiently exceptional" to warrant forcible medication of the defendant. *White*, 620 F.3d at 421–22. The court concluded it was not and warned that authorizing the forcible medication of "an all-too-common, non-violent, long-detained defendant . . . would risk making 'routine' the kind of drastic resort to forced medication for restoring competency that the Supreme Court gave no hint of approving in *Sell*." *Id.* at 422. It reasoned the "imperative of individual liberty" foreclosed starting "down a path that would essentially permit the government to forcibly medicate any and every defendant deemed incompetent to stand trial, no matter how little public good or benefit will be achieved in doing so." *Id.*

Obviously, this case is not on all fours with *White*, any more than it is with *Bush* or *Evans*. But in light of the analysis in *White*, it is clear that the government's interest in prosecuting Mr.

17

Malone for the charged offenses does not rise to the level of warranting his forcible medication. The government's cursory attempt to convince the Court otherwise should be soundly rejected. *Cf., e.g.*, *United States v. Charrette*, 761 F. Supp. 3d 373, 393–96 (D. Mass. 2025) (finding first *Sell* factor not met despite serious crime of "dousing a restaurant, after hours, in gasoline and causing a large explosion"); *United States v. McCray*, 474 F. Supp. 2d 671, 677–79 (D.N.J. 2007) (same for three robberies that involved brandishing and assaults).

## II. The government has not attempted to meets its burden on the remaining factors.

Based on the BOP's request for a preliminary ruling on the first *Sell* factor, the government asks the Court to look at that factor in isolation. But the government offers no authority for that procedural move. Courts have recognized that the first *Sell* factor "dovetails" into the remaining factors. *See Grigsby*, 712 F.3d at 975. Indeed, the second and third factors expressly look at whether and how forcible medication furthers the government's asserted interest. It is not surprising, then, that courts have declined to address every factor when the government has failed to meet its burden on one of them. *See, e.g.*, *United States v. Watson*, 793 F.3d 416, 423 (4th Cir. 2015) (declining to reach other *Sell* factors when the government had not met is burden of proving at least one of the factors by clear and convincing evidence).

Here, the government has not met its burden on the first factor. But whatever the case, the government has not even attempted to meets its burden on the other factors. Absent some authority to support the bifurcation of this fact-intensive and interconnected standard, the Court should deny the government's motion for that reason alone. Otherwise, a ruling on the first factor risks being advisory, should the information about Mr. Malone's potential treatment plan and the side effects of his potential restoration not turn out favorably for the government. "It is among 'the oldest and most consistent thread[s] in the federal law of justiciability . . . that the federal courts will not give

advisory opinions[.]'" *United States v. Batato*, 833 F.3d 413, 422 (4th Cir. 2016) (quoting *Flast v. Cohen*, 392 U.S. 83, 96 (1968)).

## Conclusion

The forced administration of antipsychotic medication is a profound intrusion into a person's autonomy. Its very purpose is to alter a person's mental state, which necessarily deprives him of the ability to make freely even the most basic decisions. Mr. Malone's alleged conduct does not warrant such an intrusion. Neither does the government's asserted need to lock him up. And even if the Court determines otherwise, the government has disclaimed any attempt to meet its burden on the other *Sell* factors at this juncture and failed to provide any authority for the Court's ability to rule split the analysis. The Court should deny the government's motion.

One last point. Despite finding for the government on the first *Sell* factor, both *Evans* and *Bush* ultimately concluded the involuntary administration of antipsychotic medication was not constitutionally permissible in light of the remaining *Sell* factors, given the records on appeal. *Evans*, 404 F.3d at 241–42; *Bush*, 585 F.3d at 815–18. While the Fourth Circuit subsequently permitted the forcible medication of Mr. Evans for purposes of standing trial, *United States v. Evans*, 199 F. App'x 290, 291 (4th Cir. 2006) (unpublished per curiam opinion), the court in *White* expressed profound discomfort with that ruling in light of the fact that separate juries subsequently found Evans not guilty of threating to kill a federal judge and assaulting a federal employee. *White*, 620 F.3d at 418 (stating consideration of the defendant's probable sentence flouts the presumption of innocence and is "particularly troubling" and "unsettling" given the acquittals). The Fourth Circuit's consistent skepticism of and disdain for the unsavory and problematic practice of forcing someone presumed innocent to endure significant violations of his privacy, autonomy, and bodily integrity simply to stand trial should give this Court pause as it considers the government's request.

Respectfully submitted,

MICHAEL LEE COREY MALONE

By    /s/
   Of counsel

Amanda C. Conner
VSB # 88317
Assistant Federal Public Defender
Office of the Federal Public Defender
500 E. Main Street, Suite 500
Norfolk, Virginia 23510
(757) 457-0816
(757) 457-0880 (telefax)
amanda_conner@fd.org

20